May it please the Court. My name is John Peace. I'm from Greenville, South Carolina. It's an honor and a privilege to be before Your Honors today on behalf of my client, Rhonda Lynn Henderson. This Court should reverse the district court and remand this case to Hartford to clarify the conflicting information regarding Ms. Henderson's ability to perform the functional requirements of her job as an office manager in Spartanburg, South Carolina. In this case, of course, Hartford received information from several different doctors. First, the treating physician, Dr. George Bass, completed an attending physician statement dated March 19, 2013, indicating that Ms. Henderson was disabled as a result of back pain, headaches, intermittent dizziness, intermittent arthritis, and the records included problems with neck and radicular symptoms. Dr. Bass went on to say that she couldn't lift or stand long because of her back and her condition was indefinite. Cut to the chase on this case here. Yes, Your Honor. We could spend some time going over those procedural facts, but you know this Court has already read all this. Yes, Your Honor. You would better spend your time dealing with the things that we'd probably like you to focus on. Yes, Your Honor. We got Dr. Bass' report, and that's it. She gets the disability determination. I understand the next day then the physician that Hartford had already mailed a request from a month later then sends it, happens to come in the next day so she can work. So then they undertake some efforts to bring in a third party, and the result is still the same. You've got a social security determination, but I don't think you're going to maintain that the standards are the same for those. No, Your Honor. So where are we? I mean, it seems to be, it just, when I look at it, I mean, I'm not sure they even had to get that third party, or did they? Well, Your Honor, as a matter of fact, they recognized the need to get that additional opinion themselves, and if you look at the record, this is in the summary detail report prepared by the Hartford adjuster and her supervisor. The supervisor specifically said, and this runs through it, at the record of page 56, the supervisor says the ability analyst should contact the attending physician's office to clarify the response. That's after they received Dr. Jacobus' questionnaire response saying that she could work, which was clearly in conflict with the attending physician's statement and the questionnaire filled out by Dr. Bass. So they recognized it then, and then the records go on. They attempted to contact first Dr. Jacobus to see if she really could return to work. There were problems with getting the form to Dr. Jacobus. Finally, he did respond and say that she could return to work. But then that was in May of 2013. In July of 2013, Dr. Bass, of course, had left the practice because of his own medical issues, and Ms. Henderson went to see Dr. Reardon in the same practice as Dr. Bass, and, of course, Dr. Reardon saw her for the first time on July the 10th, 2013, didn't have any experience with her. So the first time he sees her, she comes in with disability paperwork. He goes back through and examines her and basically finds all the same diagnoses, conditions, and complaints that Dr. Bass had memorialized in his records. And then, of course, he also notes that there's been a... What is his conclusion, though? Well, he goes on to say that this is an indefinite condition. It's the same conclusion that Dr. Bass gave. He said the patient cannot lift or stand for long periods of time due to back pain. This is felt to be an indefinite condition. He also notes that there was no change in the patient's physical condition from March of 2013, with the exception of the additional diagnosis of carpal tunnel syndrome. So Dr. Reardon appears to support Dr. Bass's opinion from the attending physician statement that Ms. Henderson can't work. And so based on these notes, then, there was a document that was, I believe, Hartford's representative who drafted it called it a clarification letter, which appears in Hartford's notes on page 33 of the record. In there, the... I thought Dr. Reardon's conclusion was that she was capable of full-time work with certain restrictions. As a matter of fact, well, that is what his questionnaire response said, Your Honor. I believe Dr. Jacobus actually said she could work with certain restrictions. Dr. Reardon, of course, appeared to repeat the conclusions from Dr. Bass. And then on October 6, 2013, Patricia LaBerge, who's apparently a nurse for Hartford, composed and sent a clarification letter to Central Print that will be mailed to Dr. Reardon Monday morning with attached prior restrictions from both Dr. Bass and Dr. Jacobus. And you can see what the thinking was here. We've got Dr. Bass that says she can't work. We've got Dr. Jacobus, on the other hand, who says that she can. And now she's seeing Dr. Reardon at the primary care doctor. Let's see who he sides with, and we'll use that to determine how this conflicting evidence should be resolved. And, of course, they send that October 6 letter to Dr. Reardon. He responds promptly by agreeing with both of them, which doesn't really cast a lot more light on the underlying issue. Wait, you say both of them. Yes, Your Honor. It's at page 184 of the record. They specifically wrote to Dr. Reardon, and they said, Dr. Reardon, we've enclosed the most recent restrictions from Dr. Bass. Do you concur with Dr. Bass's restrictions stated on the attending physician's statement on March 17, 2013, that Ms. Henderson can't stand for prolonged periods as limited to lifting 10 pounds frequently, 20 pounds occasionally? He says yes, which would seem to support the attending physician's statement of disability submitted with the initial claim. But then he goes on, the letter goes on to say, do you concur with Dr. Jacobus as stated May 29, 2013, which, as we were discussing, Judge Diaz, that's when Dr. Jacobus said that she could work full-time with these restrictions. And Dr. Reardon agreed with that as well. And I would submit that given these two apparently conflicting and perhaps mutually exclusive opinions, from one from Dr. Bass and one from Dr. Reardon, that Dr. What's the conflict in those two statements, that she can't stand for prolonged periods, can't lift 10 to 20 pounds, but is capable of work with restrictions with respect to reach finger and handle at desk level? That doesn't seem to me to be inconsistent. Your Honor, Dr. Bass is, it's in two separate paragraphs with two different check boxes. Of course, he says that he agrees with Dr. Bass that she can't stand for long periods limited to lifting no more than 10 pounds frequently and so on. He goes on to agree, as Your Honor pointed out, he agrees with Dr. Jacobus as well, who says that she can work full-time work with the restrictions provided on step two. What kind of job did she have? As a matter of fact, Your Honor, her job, she was an office manager in a nursing home. Her job description is at page 263 of the record, and specifically it says she was responsible for all facility billing accounts receivable and collection activities and supervising the billing and collections personnel. She had a desk job is what you would call it, wouldn't it? That's what the employer called it on the employer's response. What else are you going to call it? I mean, she's not required to do these restricted activities based upon what it seems like that it says there. Well, as a matter of fact, the job description in the record at 264 goes on to describe her working conditions to say, works in office areas as well as throughout the facility must be able to move about intermittently during work hours, including standing, lifting, bending, stooping, twisting, pushing, and pulling. And it goes on to say, must be able to effectively communicate with the management staff, medical staff, nursing staff, and other unit supervisors. Is there any indication she couldn't work in that job with the limited restrictions that Dr. Ribman enumerated? As a matter of fact, Your Honor, after they began communicating with Dr. Yacobas, they also spoke to the claimant herself. And she specifically told them this is in the record as in July of 2013. After they had obtained the opinion from Dr. Yacobas, she called to advise them that her condition had worsened. I apologize for not having that page. An employee reported that she's unable to work due to daily migraines, carpal tunnel syndrome, left worse than right, low back causing her to be unable to sit, stand, or walk for any prolonged period of time. So go back to the doctor and get that verified? Why wouldn't she go back? If it's worsened, why wouldn't she go back to Dr. Ribman or presumably another doctor? Well, as a matter of fact, Your Honor, she did return to Dr. Reardon July 10, 2013. And then, of course, again in January of 2014. July 2013, of course, Dr. Reardon had just started seeing her, didn't have a lot of experience with this particular patient. And so I would suggest that in order to resolve the conflicting evidence between Bass and Yacobas and then the sort of ambiguous response from Dr. Reardon, that the best method of resolving this conflict would have been for Hartford to simply send her for a functional capacity evaluation or if she wasn't capable of doing that because of her symptoms, just an independent medical exam. Or at the very least, I mean, they went so far as to commission a report from Dr. William Abram at PDA to go through all the medical records. And he apparently made three attempts to contact Dr. Reardon, and the dates are listed at page 122 in the record. But as we all, I presume, know, when you call a doctor's office, you're highly, it's unlikely you're going to get that physician to answer the phone. You're going to get the secretary who may be able to schedule an appointment with you, but not before you go and supply medical authorization that's consistent with HIPAA and probably also pay for that doctor's time. We saw Dr. Yacobas charge $75 just to fill out that two-check checkmark form that was sent by Hartford. So if they really wanted to resolve this problem, which they continued to recognize the need to do as late as October 6, 2013, that they needed to resolve this conflict, they just never did get to that point. Now, of course, the district court quoted Dr. Abram's report saying that no communication was necessary with Dr. Reardon, but that seems inconsistent with Hartford's own conclusions that are included in the summary detail report. Hartford did believe that somebody needed to talk to these doctors to resolve this conflict, and I'm not suggesting there be any categorical rule. Well, I mean, the notion that perhaps they wanted to be as thorough as possible does not equate to an abuse of discretion in failing to check that last block, does it? Well, Your Honor, an abuse of discretion would be if the decision-making wasn't principled and reasoned and wasn't based on substantial evidence, and substantial evidence being more than a scintilla but less than a preponderance, would it lead a reasonable person to believe that she was either disabled or not? And as we look at this record, I think it appears to me that you've got Dr. Bass, who clearly supported disability. You've got Dr. Yacobas, who only began seeing her as well in, I think, May. It might have been April. She was referred by Dr. Bass to Dr. Yacobas, but he had a limited amount of experience with this patient. And then she goes to see the third doctor, Reardon, who had only started seeing her in July. So Hartford's soliciting opinions from doctors who really don't have a long history with the patient, and they seem to give inconsistent or conflicting responses. So, Your Honor, I think in this case it was an unreasonable denial simply because they didn't have substantial evidence indicating one way or the other. I mean, there was some evidence to indicate she's disabled, like Dr. Bass and the Social Security opinion. And the Social Security opinion, just as an aside, I think is an important piece of evidence here because this 400-page record is relatively small for an ERISA case. And also I'd point out I didn't prepare the appeals in this case, so I didn't have a firsthand opportunity to put information into this claims file. But what we do have in the Social Security opinion here is a well-reasoned decision that goes through diagnostic studies which aren't in this administrative record. And it also discusses other medical records that I don't think is in this administrative record. Judge Batson concluded that she was disabled from any occupation that was reasonably available in the area where she lives. Now, the definition of disability before Hartford at the time they denied this claim was an own-occupation definition of disability. And while it may be a sedentary position, this own-occupation that she was doing was a demanding job. She had been doing it for 14 years. The record lists her hire date as 1998. So she'd been doing this job for 14 years, and the record doesn't indicate she ever had any problems performing it. So as these problems were— Was the Social Security determination based upon Dr. Jacobi's or Dr. Reardon's evaluations? Your Honor, I don't believe that the Social Security opinion had Dr. Jacobi's opinion. It was actually authored on—Judge Batson signed this order on June 19, 2013. Jacobi's first opinion that he provided to Hartford, I believe, was May—no, I'm sorry, April 12, 2013. I guess my question is going to aren't they based on two different types of evidence put forth to them? They're both based on medical evidence, Your Honor, and they're both interpreting medical evidence. They're applying two different definitions of disability, obviously, and that's why the Social Security decision is not determinative in the LTD context. Didn't Hartford do an employability analysis report to determine if she could work within those restrictions? Your Honor, the employability analysis report's at 155 in the record. As a matter of fact, this 28-page report pretty much describes whether there are jobs available in the area with these restrictions, and I don't know that it really sheds a lot of light on the issues before the Court today because the employability analysis report really analyzes whether there are jobs available with these requirements in the area. Now, she was originally found disabled and then denied under an own-occupation definition of disability, but I think the parties would agree there are a lot of sedentary office jobs in Spartanburg, South Carolina, so I don't know that that's really an issue that was much in dispute. We agree that there are jobs available. We just disagree that she was not – we disagree that she was able to perform them. All right. All right, if you want to save time for rebuttal, you may do so. Thank you, Your Honor. May it please the Court, excuse me, my allergies are acting up this morning. I am Debbie Harden of the North Carolina Bar, and with me today is Kathy Lange of both the North and the South Carolina Bar. Your Honor, in listening to your questions, I think I can go to the heart of the matter here and point out some particularities in this record that demonstrate that Hartford conducted a disciplined and reasoned process and it was supported by substantial evidence. As Your Honor indicated in your first question, let's go to the heart of the matter and Dr. Bass's opinion that he sent in a questionnaire on April 9, 2013. On April 9, 2013, Dr. Bass had not seen Ms. Henderson for over four months. The March analysis that he sent as the physician's attendance statement that he dated and signed and listened to her functionalities indicated he last saw her on November 29, 2013 and that another visit was not scheduled. He signed that in mid-March and he sent his questionnaire in in April. In contrast, now he was the internist, Dr. Jacobitz, the specialist, had started treating her on October 10. He saw her in October. He saw her on November. I forgot the date, but in November. He saw her again on December 5 and he signed on December 5 another out-of-work notice for at least two months. He saw her in February and he said she was improving. He saw her in April, nine days before he completed and signed his questionnaire where he disagreed with Dr. Bass. Now, Dr. Bass... I got that the day after Hartford had granted her disability. I assume you're telling me if you got it the day before, you might not have given those benefits. I think we would have investigated further just like we did because Dr. Jacobitz, when they got Dr. Bass's opinion, Dr. Jacobitz had already said she should be out of work. She'd been out of work from August through his February visit. So that wasn't inconsistent when they got Dr. Bass. Why did you need to do a third one then? I mean, if you got the report of Dr. Jacobitz, you even got the one from Dr. Reardon, who the appellate says that Dr. Reardon's report basically parrots the kind of functional findings from Dr. Bass, even though it does come to a contrary ultimate conclusion that she's able to go back to work. So he basically tracked, and from that perspective, as I gleaned from his statement, he's saying that it was inconsistent, internally inconsistent, and therefore that's the reason you had to go find a third person. And when you did, that review that was done, I guess by Dr. Abramson? Dr. Abramson, yes. Was sort of cursory because all he did was just look at the naked record. He made a few calls, two or three calls to Dr. Reardon, but the appellate said, you just can't call a doctor up, not even in Spotsburg, and get an opinion. You don't expect them to return your calls. So therefore he did the best he could, but it wasn't enough. Well, Your Honor, I disagree with my opponent. I believe that it more than met the standards applicable. We had Dr. Bass's contrary opinion. We had Dr. Jacobit's opinion received a day after, as you said, they granted long term. So she had been on disability from August of 2012 until April of 2013 when that opinion came in. When it came in in April, it said that he expected marked functionality improvement by May. So what did Hartford do? Hartford on April 18th called Dr. Jacobit's office and asked him to clarify what he meant by avoid repetitive activity. And his office responded he meant that with respect to weight and the lifting of weight. So they waited. They calendared it and they waited. They waited until May and they sent him a follow up and said, what is your opinion now? And on May 29th, Dr. Jacobit signed a questionnaire that said she is ready to return to work full time. Now, in the interim, Hartford had spoken with Mrs. Henderson and she had said Dr. Bass was no longer treating her. But interestingly, according to the administrative record, when Hartford told Mrs. Henderson on June 18th that Dr. Jacobit had released her to return to work, she said, oh, well, Dr. Bass is treating me. So what did Hartford do? That same day, Hartford sent Dr. Bass another questionnaire. And let me read you what it specifically said. In June 2013, we received information from your patient's treating physician, Dr. Jacobit. Dr. Jacobit states, Mrs. Henderson is currently capable of performing her own occupation full time. Do you agree with Dr. Jacobit? They sent that on June 18th and they attached Dr. Bass's March attending physician statement along with both of Dr. Jacobit's reports from April and from May. They didn't get a response. So what did they do? On July 2nd, they sent it again to Dr. Bass's office and said, second request, please respond. Same packet of information. They also sent another letter on July 2nd, and that was to Mrs. Henderson. And they said, we need additional information. Please urge Dr. Bass to respond. Dr. Bass's office then reported that he was out sick and would be out sick for at least another month. So they callored it to follow up with him in another month. In the interim, they received Dr. Reardon's July 10 medical report where she had come in. Dr. Reardon worked in the same office as Dr. Bass. And Dr. Reardon's notes say that she came in for completion of long-term disability paperwork. But we didn't get back the questionnaire response we had sent or any real functionality information except repeating what Dr. Bass had said in March. So we did a couple of more things. This extensive recitation of the facts in terms of what you actually did really is just to go to your whole conclusion that what Hartford did was reasonable. Yes, Your Honor, and I believe that's the standard, is whether or not Hartford conducted a reasoned and disciplined review. Give me some facts that are not in the record that we haven't already read. I mean, is there anything else? In other words, we're going to take everything you've given me so far I've read. I feel like I'm rehearing it. And I know that's your argument, but I'm saying, is there anything else we need to know about this that you can take from the record that's not in your brief or there? Yes, Your Honor, there is. Look at what's not in this record. In the light of Dr. Jacobus' September opinion and Dr. Reardon's October, we deny. Mrs. Henderson then hires counsel. She hired him as of December 19. And what's not in the record is even though we responded to that counsel in January and we gave him this record that's before Your Honor with all of these medical opinions in it, and in particular the September and the October opinions. I didn't really want to invite you to give me things that are not in the record. Well, I mean, he did not. What I'm saying is something else you want to highlight that was presented below and has been preserved on appeal for presentation. I guess what I'm trying to say is basically you're reciting facts I already kind of have read. Is there something else? I mean, we got that point. Let me put it directly. Mrs. Henderson was represented by counsel. Counsel received this record. And counsel did not submit on behalf of Mrs. Henderson any further information that she was not capable of performing her job, office manager, at that time. And counsel knew that we had these opinions that said she was ready to work and that she had a job within these limitations, not only hers but several others in the economy. So I apologize if I responded improperly. But I wanted to point, Your Honor, I rambled.  I rambled, Your Honor. But, you know, in a normal situation, if someone is suffering severe symptoms where they're not able to work, then you would see contrary opinions and contrary medical evidence coming in on the appeal. And we specifically asked for it. And we did not receive it. The only things we received on appeal were three visits of Dr. Riordan, of which we already had one, and the Social Security determination. And as Your Honor has already pointed out, the Social Security determination is under different standards and with a different timeframe. Social Security determination was as of June 2013. Dr. Riordan and Dr. Jacobus' further opinions and functional limitations were in September and October. But even more so, if you actually look at the Social Security determination record, the administrative law judge found that she could perform a sedentary job function with one exception. And that was she was not able to frequently finger and handle and reach. That was the exception. And he said under those circumstances, under the Social Security guidelines, I am required to find her disabled. What happened after June was the clarifications on functionality. And both Dr. Riordan and Dr. Jacobus confirmed that she could frequently reach and finger. So you're saying the Social Security report wasn't based on Dr. Riordan's or Dr. Jacobus' report? No, Your Honor. It certainly wasn't in September and October. Thank you. Your Honor, if this Court has any further questions, I'll be happy to respond. But I believe that on this record, Hartford acted appropriately. There is an established, deliberate, and reasoned process. Mrs. Henderson did not produce any information on appeal that her condition had changed or that she was not disabled. And ultimately, she does bear the burden of coming forth with information to establish that she is disabled under the terms of this policy. Thank you. Mr. Peace, you have a few moments for rebuttal if you choose to use them. Your Honor, one point I believe that we agree on is that more functionality information would have better informed the decision made by Hartford Insurance Company in this case. And I think that was the objective of Hartford when they requested opinions from Dr. Bass and then when he became unavailable, Dr. Riordan and, of course, Dr. Jacobus as well. These are all treating physicians. None of those were selected simply to give an opinion in this case like Dr. Abram. I would point out, though, as I requested this Court, if you remand this case and have them do a functional capacity evaluation, they'll have the functionality information that Hartford itself identified as what they needed back in October of 2013. Now, Ms. Henderson did submit statements from her treating physician, Dr. Bass, in support of her appeal. And she also submitted through counsel her Social Security Disability Award. That, combined with the ambiguity in Dr. Riordan's response to the Hartford questionnaire, I think begs the question, is she able to do the job or is she not? If she goes and has a functional capacity evaluation performed by a physical therapist to measure her ability to grasp, reach, stoop, twist, pull, walk, and so on, and that comes back and says she can do this job, then clearly Hartford made the right decision. But right now Hartford doesn't have that information. And that's what they should have done in this case. They should have perhaps had Dr. Abram as an initial step. Just make sure that Dr. Abram calls Dr. Riordan and says, you know, I've reviewed your records, but it's not clear to me, based on this record, what her physical capacities are. Now, Dr. Abram makes some pretty strong opinions based on the naked record, as the Court has described it. But, again, I would look at, he is retained, he's a paid expert. He's never seen Ms. Henderson. He's never talked to any of the three treating physicians that we've discussed today. So I think to satisfy the requirements of ERISA, which is a reasoned and disciplined decision-making process based on substantial evidence, this case should reverse the district court so that Hartford can take it back on remand and have a functional capacity evaluation done, or if, barring that, an independent medical examination. It's true, is it not, Mr. Peace, that Ms. Henderson had the burden to prove disability here? That is true. And, Your Honor, And, of course, we're in an abusive discretion context, yes? Yes, sir. And you said in your opening argument that, or I thought you suggested that substantial evidence was a requirement for the denial. Did you say that? Do you believe that? Yes, Your Honor. It's my understanding that in evaluation of an ERISA case, for a denial to be reasonable, it has to be supported by substantial evidence. And if you have a physician's report, not otherwise impeached, that the person is able to go back to work with limitations, supported by a second physician, I would be hard-pressed to view that as anything other than substantial evidence. You can disagree with it, but surely it's substantial evidence. Your Honor, with all due respect, I would disagree with characterizing this as having two doctors saying that she can work. Dr. Bass said that she couldn't. And, in fact, in the follow-up questionnaire, he gave some specifics on why she couldn't. He didn't give maybe the level of functionality detail that we might like, but he repeatedly said she couldn't work. Dr. Jacobus, on the other hand, said she was disabled for a while, but noted improvements that Dr. Bass, of course, wasn't around to see. Which makes… Let me clarify something. At least the counsel for the other side seemed to have indicated Dr. Bass hadn't seen her for a period of, like, four months. That's correct. And in the intervening time, Dr. Jacobus, the specialist, was seeing her. Is that not significant? Well, it… At least in the determination of reasonableness? Well, Your Honor, again, in this case, Dr. Bass supported disability, Dr. Jacobus didn't, but the doctor who saw her last, who was Dr. Reardon, seemed to go with Dr. Bass, but then agreed with him. I mean, even though he went there, he comes out with these restrictions. They then do an evaluation analysis to see if she can work within those restrictions. I mean, his conclusion is she can work, even Dr. Reardon. I mean, I know you characterize it as being inconsistent, but he's got to know what he's seeing. He's a doctor. If he says he can work, I mean, he understands what that is. He says, I agree with Dr. Jacobus. Your Honor, the opinion attributed to Dr. Reardon is simply, it's nothing but two X's and two yes-no questionnaires. You know, again, not the functionality you need to determine whether she can actually work. And I would suggest that he probably read the first line that said, do you agree with Dr. Bass's attending physician statement? Check yes. And then there's another doctor who's listed here that, do you believe that she can work full-time? He checks yes there, too. I mean, clearly the two are inconsistent. It doesn't resolve the issue before Hartford at this time or the issue before the court today. The information isn't clear and it isn't substantial of whether she can work or not. That's why the proper course in this case would have been to have a functional capacity evaluation and simply settle the matter. And that would have done away with the need for the litigation and this appeal if they had simply done a functional capacity evaluation way back in October of 2013. Thank you, Mr. Peace. Thank you, Your Honor. We're going to come down and greet counsel and proceed to the last case we'll hear for today.
judges: James A. Wynn, Jr., Albert Diaz, Andre M. Davis